IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *f/u/b/o Aarow Electrical Solutions, LLC*, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:25-cv-01236 (AJT/IDD) |
| LIBERTY MUTUAL INSURANCE CO. | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this Miller Act[1] case, Plaintiff-Relator Aarow Electrical Solutions, LLC ("Aarow" or "Plaintiff"), an electrical subcontractor on a federally-funded construction project in Quantico, Virginia, seeks to recover unpaid fees in the amount of $5,275,043 from the prime contractor's surety, Defendant Liberty Mutual Insurance Company ("Liberty," or "Defendant"). Pending before the Court is Liberty's Motion for Partial Summary Judgment ([Doc. No. 45] (the "Motion") in which it contends that Aarow lacks sufficient evidence as a matter of law to recover three specific categories of damages that collectively constitute at least $3,754,424 of Plaintiff's total damages claim in the amount of $5,275,043, and that Aarow's maximum recoverable claim at trial is therefore limited at most to $1,353,038.

The three issues central to Liberty's Motion are (1) whether the governing subcontract's "No-Damages-for-Delay" clause is enforceable, (2) whether Aarow meets the prerequisites to recover home office overhead costs, and (3) whether pursuant to the Subcontract and Contract

[1] The Miller Act provides a cause of action for any parties that provide labor or material for a federally-funded construction project to recover sums justly due. 40 U.S.C. §§ 3131- 3133. Its specific provisions require prime contractors to post payment bonds, require the Federal Acquisition Regulation to provide alternative protections to suppliers, and grants a private right of action to any subcontractors or suppliers to recover against the prime for any costs unpaid for 90 days or more. *Id.*

Disputes Act, 41 U.S.C. § 7103(g), Aarow waived its right to seek costs incurred from replacing allegedly-noncompliant metal-clad cable ("MC Cable") work by failing to appeal the government contracting officer's final determination of noncompliance .

For the reasons below, the Motion is **GRANTED** as to Arrow's claim for delay damages, which include its claimed unabsorbed home office overhead costs, and is **DENIED** as to Aarow's purported waiver of its right to recover the MC Cable claim.

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated:

A. Background on the Project and Contract Structure

This action arises out of the construction of the P021 Middle School/High School Replacement Project at Marine Corps Base Quantico, Virginia (the "Project"). The United States Government, acting through the Naval Facilities Engineering Command Washington, awarded the prime contract for the Project to John C. Grimberg Co., Inc. ("Grimberg") on November 20, 2017. [Mot.] at 2 ¶ 1; [Doc. No. 38] ¶ 1. Pursuant to the Miller Act, Grimberg furnished a payment bond for the Project, with Liberty as surety. [Mot.] at 2 ¶ 2; [Doc. No. 1-1]; [Doc. No. 38] ¶ 3. The bond was intended to secure payment to subcontractors furnishing labor and materials to the Project. *Id*.

On December 11, 2017, Grimberg entered into a subcontract with Aarow (the "Subcontract") in which Aarow agreed to furnish and install electrical work in strict accordance with the Prime Contract documents. [Mot.] at 2–3 ¶¶ 3-5; [Doc. No. 38] ¶¶ 4-6; [Doc. No. 46-3] at 2. Maryland law governs the Subcontract, except as required by controlling law. [Mot.] at 3 ¶ 6; [Doc. No. 38] ¶ 14(k); [Doc. No. 46-3] at 7 ¶ 33.

The Subcontract incorporated certain of Grimberg's standard terms and conditions ("STC"), including a "No-Damages-for-Delay" clause in paragraph 9 which limited the remedies available to Aarow for delays to work under the subcontract. [Mot.] at 7 ¶ 30; [Doc. No. 38] ¶ 14(f); [Doc. No. 46-3] at 5 ¶ 9. This clause provided different remedies depending on which party or nonparty caused the delay in question: for delays caused by Grimberg, Aarow was entitled only to a time extension and no monetary compensation, even if such delays were not contemplated, amount to abandonment, or were caused by active interference. *Id*. For delays caused by the Government, by nonparties, or those otherwise outside of Grimberg's control, Aarow was entitled to be reimbursed for delay damages actually recovered by Grimberg from the Government. [Mot.] at 7 ¶¶ 28-29; [Doc. No. 38] ¶¶ 14(e)-(f). The Subcontract also contained a "flow-down" provision (at STC ¶ 1) which purported to impose on Aarow all of Grimberg's obligations, risks, responsibilities, and rights under the prime contract.[2] [Mot.] at 3 ¶ 8; [Doc. No. 38] ¶ 14(a); [Doc. No. 46-3] at 4 ¶ 1.

The original Subcontract sum was $7,125,000, later increased by change orders to $8,600,004.26. [Doc. No 46] at 4 ¶ 10; [Doc. No. 38] ¶ 7; [Doc. No. 46-6]. As of January 22, 2026, Grimberg had paid Aarow $7,889,648.60. [Mot.] at 4 ¶ 11; [Doc. No. 38] ¶ 8; [Doc. No. 46-6].

B. Project Implementation and Suspension of Work

The Subcontract identified an original Contract Completion Date ("CCD") of January 11, 2020 for the school building, based on a notice to proceed date of December 7, 2017. [Mot.] at 4

[2] Specifically, the flow-down provision states that "[e]xcept as otherwise provided in this Subcontract Agreement, the Subcontractor shall be bound to Grimberg in the same way that Grimberg is bound to the Owner under the Prime Contract Documents, and the Subcontractor shall assume toward Grimberg all of the obligations, risks and responsibilities which Grimberg has assumed toward the Owner under the Prime Contract Documents." The same provision confers on Aarow the right "to enforce all of its rights and remedies and to defend against claims against it by the Owner" according to the terms of the subcontract's disputes section. [Mot.] at 3 ¶ 8.

¶ 13; [Doc. No. 46-3] at 1. The baseline schedule contemplated that Aarow would complete its work prior to the CCD. [Opp.] at 3–4; [Doc. Nos. 49-50]; [Doc. No. 46-8] at 21 ¶ 5.2.5. The original CCD was subsequently extended multiple times, and still had not been achieved as of the filing of the Motion. [Doc. No. 38] ¶¶ 15, 23-24.

On June 26, 2020, the Government suspended all work on the Project. [Mot.] at 4 ¶ 15; [Doc. No. 38] ¶ 15. The suspension stemmed from concerns regarding the structural integrity of Insulated Concrete Form ("ICF") walls installed as part of the school building, specifically, that Grimberg's subcontractor in charge of building the ICF walls, Progressive Construction Solutions ("PCS"), improperly placed steel reinforcement bar within (rather than outside) the ICF wall forms. [Opp.] at 4–5, 12–13; [Doc. No. 50] ¶¶ 2-3; [Doc. No. 50-1]. The Government concluded that the walls posed a significant safety risk and were noncompliant with the Prime Contract requirements. [Opp.] at 4–5; [Doc. No. 50-2]. In July 2021, the Government directed that the ICF walls be demolished and rebuilt due to widespread nonconformance, including the misplaced reinforcing steel. [Opp.] at 4–5; [Doc. No. 50-2].[3] Demolition and reconstruction of the walls extended from late 2021 into 2024, [Opp.] at 5; [Doc. No. 50-3], although the Government's suspension of all work on the Project ended on September 15, 2022. [Mot.] at 5 ¶ 16; [Doc. No. 38] ¶ 27. As of the time the Motions were filed, Aarow had not completed all work contemplated by the Subcontract, as the second phase of the Project had not yet commenced. [Mot.] at 4 ¶ 12; [Doc. No. 46-21] ¶ 7; [Doc. No. 38] ¶ 10.

[3] In separate litigation related to the Project, the ICF walls as first installed were deemed to pose a significant risk of serious harm, injury or death to the occupants of the building, due to their vulnerability to lateral forces or moment capacity in the event of heavy wind lateral loadings from hurricanes, earthquakes, tornados, and blasts. *See John C. Grimberg Co., Inc. v. Nudura Corporation, et al.*, Case No.: 8:22-cv-02586-DKC (D. Md. Nov. 14, 2023) (the "Nudura Case").

Liberty characterizes the wall defects and resulting delays as issues for which Grimberg exercised diligence in remediation and reasonably relied upon the expertise of its subcontractors on the wall design and construction, including the Nudura Corporation, which owned the patented ICF wall technology system and submitted the design and specifications to the Government's Designer of Record, and the construction engineering firm ECS Mid-Atlantic, LLC, whom Grimberg retained specifically to inspect and perform quality control on the wall installation. [Reply] at 5–6; see also [Doc. No. 50-9] at 27, 81. Aarow, for its part, contends that the wall defects resulted from Grimberg's gross negligence in agreeing to build ICF walls without prior experience, failing to adequately review or call out the walls' purportedly-flawed design during the mock-up process, and failing to adequately inspect the walls during construction. [Opp.] at 10–14; [Doc. Nos. 50-1, 50-7, 50-8, 50-9].

On September 30, 2021, Grimberg and the Government executed a settlement agreement resolving claims related to the ICF walls and associated delays. [Mot.] at 5 ¶ 17; [Doc. No. 38] ¶ 18. The settlement was incorporated into the Prime Contract on December 10, 2021. [Doc. No. 47] at 5 ¶ 17; [Doc. No. 38] ¶ 18. The settlement extended the CCD by 2,031 days to August 1, 2025 and established a beneficial occupancy date of January 1, 2024. [Mot.] at 46 ¶ 18; [Doc. No. 38] ¶ 21. Paragraph 2 of the Settlement Agreement further provided that Grimberg "waive[d] and release[d] any and all existing claims and potential claims arising out of or relating to the Contract," and that Grimberg's "waiver includes any and all claims and potential claims by subcontractors and suppliers at any tier." *Id.* ¶ 26. Grimberg did not inform Aarow that the Settlement Agreement was proposed or would be executed, and Grimberg did not include Aarow in the negotiations over its terms and releases. *Id.* ¶ 20.

Aarow's work on the construction project suffered four material "windows" of delay, totaling 1,988 days, with the Government responsible for a single delay window (lasting 311 days), and Grimberg responsible for the remaining three windows with a total of 1,677 days of delay. which caused $3,211,076 of Arrow's claimed damages. [4] [Mot.] at 8, 12, 19; *see also* [Doc. No. 46-9] at 8.

C. <u>MC Cable Work and Nonconformance Finding</u>

Prior to the suspension of work, Aarow installed metal clad cable ("MC Cable") in various areas of the project. [Doc. No. 38] ¶ 56. MC Cable is a type of electrical conduit that consists of a flexible steel jacket wrapped around insulated wires; by contrast, rigid conduit is (as the name suggests) effectively a pipe through which electrical wires are routed. *Id.* ¶ 57. In response to a formal "Request for Information" ("RFI") concerning whether Aarow was allowed to use MC Cable, the government in February 2020 told the parties that "MC cable is acceptable [sic] as permitted by the [National Electrical Code]."[5] [Doc. No. 46-19] at 12. But the following February, after Aarow had begun installing the MC Cable, the government determined that the MC Cable as installed was not compliant with the requirements of the prime contract ([Doc. No. 38] ¶ 58; [Opp.] at 9), whereupon Grimberg on March 8, 2023 submitted, at Aarow's initiation, a request for the government Contracting Officer to issue a final determination concerning the MC

[4] These delay periods and costs were identified by Aarow's scheduling expert Eric Vannier, who analyzed Project delays and allocated responsibility among the parties. [Mot.] at 5 ¶ 23. Vannier analyzed four windows of time throughout the project, and quantified various delays in those windows. Vannier's report relied on the contracts, project documentation, and witness interviews to determine the parties' scope of work and responsibilities. [Doc. No. 46-8] at 1–2, 7–8. Vannier identified multiple delay periods and attributed 311 days of delay to Government-caused issues and 1,677 days of delay to Grimberg. [Mot.] at 6 ¶ 27. For the portion attributed to Grimberg, the report concluded that the issue with the ICF walls directly caused a delay of 1,286 days, and Grimberg's subsequent rescheduling created a 209-day delay to Aarow's "rough-in" work and a 182-day delay to Aarow's "finishes" work. [Doc. No. 46-8] at 4, 20, 32–33, 39; [Doc. No. 46-9] at 8. The Motion for Partial Summary Judgment does not dispute or challenge Vannier's findings, and in fact references and relies on them. *See* [Doc. No. 46-9] at 8.

[5] The RFI was submitted by Grimberg, and the Government's official response was directed to Grimberg. *See* [Doc. No. 46-19] at 2, 12.

Cable's compliance. [Doc. No. 38] ¶ 68; [Doc. No. 46-17]. The Contracting Officer's Final Decision ("COFD"), issued on April 6, 2023, reaffirmed the noncompliance finding, citing the fact that the prime contract specifications permit flexible conduit only where specifically indicated, including in paragraph 3.1.4.12 of the specifications (which sets out limited uses for flexible conduit). *See* [Doc. No. 46-14] at 3–4. The COFD directed Aarow, following the suspension of work, to remove all the MC Cable and replace it with rigid conduit. Neither Grimberg nor Arrow appealed the COFD, and Arrow did not ask Grimberg to do so, but rather indicated in an April 13, 2023 letter that it would proceed "under protest." [Doc. No. 46-19] at 8; *see also* [Doc. No. 46-11] at 270.

D. <u>Procedural History</u>

Aarow file this action on July 24, 2025, asserting a single claim under the Miller Act, 40 U.S.C. § 3133 (b)(1), which grants a private right of action to suppliers of labor and materials on federally funded construction projects against a defendant who is in default on payments. [Doc. No. 1]. Arrow seeks damages in the amount of $5,275,043, made up of fees that Aarow contends were unlawfully withheld. [Compl.] at 9; [Mot.] at 1, 7; [Doc. Nos. 46-7, 46-8, 46-9].[6]

## II. LEGAL STANDARD

The standard for granting summary judgment is satisfied if, after a review of the record, the Court finds that there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). There are no material facts in dispute "unless there is sufficient evidence favoring the nonmoving party." *Id.* at 249. Sufficiency of the nonmoving party's evidence is evaluated by whether a reasonable juror could find in their favor by a preponderance of the evidence; thus,

[6] On September 12, 2025, Liberty filed a Motion to Transfer venue based on a Forum Selection Clause in the Subcontract [Doc. No. 17], which the Court denied on November 14, 2025. [Doc. No. 28].

"the mere existence of a scintilla of evidence in support of the [party's] position will be insufficient." *Id*. at 252. And while the Court must resolve conflicting inferences from circumstantial evidence in favor of the nonmoving party, the review standard does not allow for the "distort[ion] of the plain meaning of words or conveniently to read them out of context." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 821–22 (4th Cir. 1995).

## III. DISCUSSION

### A. The Subcontract's No-Damages-for-Delay Clause is Enforceable

Paragraph 9 of Grimberg's standard terms and conditions, incorporated into the subcontract, states that "Grimberg shall have the right, at any time and for any reason, to delay or suspend the whole or any part of the work herein contracted for and the Subcontractor expressly understands and agrees that it shall not be entitled to any monetary compensation whatsoever for any delay."[7] [Mot.] at 7 ¶ 30. Given Aarow's position that Grimberg caused certain periods of delay, Liberty contends that as a matter of law Arrow is precluded from recovering its claimed monetary delay damages for any such periods. Liberty also contends that Maryland courts considering Miller Act claims enforce such provisions according to their plain terms, and that the clause here is similar to other provisions upheld by those courts. *Id*. at 17–18 (citing *State Highway Admin. v. Greiner Eng'g Scis., Inc.*, 83 Md. App. 621, 637–40 (Md. Ct. Spec. App.1990)). In *Greiner*, the Court of Special Appeals of Maryland reversed an award of delay damages to a contractor on a state highway project, holding that the no-damages-for-delay clause at issue was enforceable under Maryland law, even if the particular delay at issue was not contemplated by the parties. *Id.* at 639.

---

[7] This clause provides that Aarow's only remedy for delays caused by Grimberg is a time extension, even where delays are unanticipated, constitute abandonment, or result from active interference. *Id.; see also* [Mot.] at 13–16.

Aarow contends that as a matter of federal law the relied upon No-Damages-for-Delay clause is unenforceable under the Miller Act, and that even if it were enforceable, its enforceability is governed by Maryland law, which recognizes applicable exceptions to the general enforceability of no-damages-for-delay clauses, including where the party asserting the clause has committed intentional wrongdoing, gross negligence, fraud, or misrepresentation, and that the record evidence supports application of those exceptions here. [Opp.] at 10–15 (citing *Greiner*, 83 Md. App. at 639, 577 A.2d at 372); *see also Md.-Nat'l Cap. Park & Plan. Comm'n v. Wash. Nat'l Arena*, 282 Md. 588, 611 (1978) ("unless clearly prohibited by statute, contractual limitations on judicial remedies will be enforced, absent a positive showing of fraud, misrepresentation, overreaching, or other unconscionable conduct on the part of the party seeking enforcement."); *see also Martin Marietta Corp. v. Int'l Telecommc'ns Satellite Org.*, 991 F.2d 94, 100 (4th Cir. 1992) ("under Maryland law, a party to a contract cannot waive liability for gross negligence."). Aarow contends that two such exceptions apply because Grimberg acted grossly negligently in agreeing to perform the ICF work despite its alleged lack of experience with ICF construction, its failure to conduct adequate preconstruction review, its reliance on unqualified consultants without reviewing the schematics or inspecting the subcontractor's work, and its failure to recognize purportedly obvious systemic defects in the work and to allow those defects to persist until the Government suspended the Project. [Opp.] at 12–14. [Opp.] at 11–12; [Doc. No. 50-1] at ¶¶ 39, 41, 44. In support of these claims, Aarow contends that that Grimberg's Vice President in a related proceeding testified that the defects in the wall were serious, open, and obvious had Grimberg inspected them or ensured that their inspection subcontractor did so. Arrow also contends that regardless of PCS and Nudura's ICF-related qualifications, Grimberg's quality control systems manager was still responsible under the prime contract to review and

approve all installations before they were submitted to the Government. [Opp.] at 11–12; [Doc. No. 50-8]; [Doc. No. 50] ¶ 10. Aarow also argues that Grimberg manipulated and misrepresented project timelines during various phases of the project, pointing to several emails from the Government contracting officer that gave Grimberg an unsatisfactory scheduling rating and accused it of "manipulating the sequencing and resequencing of work to keep the project CCD from slipping." [Opp.] at 14–19; [Doc. Nos. 50-13, 50-14, 50-15]. Liberty responds that that Aarow's evidence, at most, supports ordinary negligence, which Maryland courts have repeatedly held insufficient to invalidate a no-damages-for-delay provision, and that whatever misrepresentations Grimberg may have made, those misrepresentations were made to the government, not Arrow.

**1. The No-Damages-for-Delay clause is enforceable under the Miller Act with respect to Arrow's claimed delay damages based on delays attributable to Grimberg.**

As the parties recognize, whether the No-Damages-for-Delay clause is enforceable under the Miller Act, as it would be otherwise, is governed by federal law.

Generally, the liability of a surety is coextensive with the liability of the surety's principal. And generally, this rule applies to Miller Act claims. However, the Supreme Court has held that a surety's liability on a Miller Act bond must be at least coextensive with the obligations imposed by the Act and as a result, a surety can enforce contract terms to limit its Miller Act liability only to the extent those terms are consistent with the Act. *United States f/u/b/o McCorvey Sheet Metal Works, L.P. v. Travelers Cas. & Sur. Co. of Am.*, No. CV DLB-22-2789, 2024 WL 2923708, at *5 (D. Md. June 10, 2024) (citing *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 215–16 (1957)) (cleaned up).

In support of its position, Aarow relies mainly on *United States on behalf of Kitchens To Go v. John C. Grimberg Co.*, 283 F. Supp. 3d 476 (E.D. Va. 2017), a case from this Court, which also involved Grimberg and a Quantico construction project, contending that the No-Damages-for-Delay clause in this case is the "exact same" as that which was found to be unenforceable in the *Kitchens to Go* case. [Opp.] at 19. Citing to the Ninth Circuit case *U.S. f/u/b/o Walton Tech., Inc. v. Weststar Eng'g, Inc.,*[8] the Court in *Kitchens to Go* reasoned that "courts must look beyond the principal's contractual liability, to the Miller Act itself, in defining the limits of coextensive liability between surety and its principal" and therefore "where subcontract terms effect timing or the right of recovery under the Miller Act, enforcement of such terms to preclude Miller Act Liability contradict the express terms of the Miller Act[,]" and thus those provisions will not be enforced.[9] *Kitchens to Go*, 283 F. Supp. 3d at 484 (quoting *Walton*, 290 F.3d at 1205–07) (cleaned up).

The rule asserted by Aarow that a surety may not enforce a no-damages-for-delay clause derives entirely from *Walton* and its progeny. The key feature of that rule is the distinction between contract provisions that affect the measure of damages owed to a subcontractor (which do not contravene the Miller Act) with those that affect or condition the subcontractor's right to recover the damages owed to it (which do). *Walton,* 290 F.3d at 1207 ("Considerable differences exist between a case in which the *measure of recovery* in a Miller Act case is determined by reference to subcontract terms governing how work performed under the subcontract will be

[8] 290 F.3d 1199 (9th Cir. 2002).

[9] In the reasoning of both the *Walton* and *Kitchens to Go* courts, the Miller Act creates a cause of action for "[e]very person who has furnished labor or material in carrying out work provided for in [the] contract[.]" 40 U.S.C. § 3133(b). Where a subcontractor "has not been paid in full within 90 days[,]" they "may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought." *Id.* Therefore, the Act "makes the 90–day provision the only condition for an action on the payment bond" and therefore "a no-damages-for-delay clause contradicts this plain statutory text by adding a condition to the action on the payment bond." *Kitchens To Go,* 283 F. Supp. 3d at 482.

compensated and one in which the timing of recovery, and, in some cases, the right of recovery"). As noted in *McCorvey,* each Court that has followed *Walton* to find that a surety may not enforce a no-damages-for-delay clause has done so based on the rationale that the clause at issue contained express or implied conditions on the timing or right of recovery by the subcontractor, and therefore contravened the Miller Act. *McCorvey*, 2024 WL 2923708, at *6 (D. Md. June 10, 2024) at *6 ("Following *Walton*, the *Grimberg* and *Continental Casualty* Courts concluded that the clauses before them were unenforceable primarily because they conflicted with the Miller Act's guarantee that subcontractors may sue for payment 90 days after the completion of the work.").

As mentioned above, the No-Damages-for-Delay clause provides for different remedies depending on which party or nonparty caused the delay in question: for delays caused by Grimberg, Aarow is entitled only to a time extension and no monetary compensation, even if such delays are not contemplated, amount to abandonment, or are caused by active interference. *Id*. For delays caused by the Government, by nonparties, or those otherwise outside of Grimberg's control, Aarow is entitled to be reimbursed from delay damages *actually recovered* by Grimberg from the Government. [Mot.] at 7 ¶¶ 28-29; [Doc. No. 38] ¶¶ 14(e)–(f). While Arrow is correct that the contractual provision at issue here is identical to the one considered in the *Kitchens to Go* case, the *Kitchens to Go* court appears to have applied and interpreted only the "non-Grimberg delay" portion of the clause, rightly determined that it contained both no-damages-for delay and pay-when-paid components,[10] and agreed with *Walton's* reasoning that

[10] Although the court did not clearly specify that the only damages at issue (which it described as "start delays and other extensions") were government-caused, that appears to have been the case given that the factual and procedural backgrounds focused on Grimberg's submission of the subcontractor's cost to the government's contracting officer and their subsequent dealings with the government pursuant to the dispute resolution clause. Kitchens to Go, 283 F.Supp.3d at 479–80. The court accordingly analyzed only the portion of the no-damages-for-delay clause that limited Aarow's recovery for delay outside of Grimberg's control to "reimbursement for any damages for delay actually recovered from the Owner." *Id*. at 479.

that portion was void for contravening the Miller Act. *See Kitchens to Go*, 283 F.Supp.3d at 481–83. Here, Liberty seeks to assert the clause as a defense only for damages allegedly caused by Grimberg, and the portion of the clause dealing with such delays *does not* include a pay-when-paid component. Therefore, that aspect of the No-Damages-for-Delay clause applicable to Aarow's claim of unenforceability does not condition the payment of recoverable damages on when Grimberg recovers those damages from the government. Rather, the portion of the clause that is applicable to Arrow's delay damages claim pertains only to the measure of damages and is therefore enforceable under the Miller Act with respect to Arrow's claim.[11]

Having determined that the No-Damages-for-Delay clause is enforceable by a surety under the Miller Act with respect to Arrow's claims for delay damages caused by Grimberg, the Court must consider whether the provision is nevertheless unenforceable under Maryland law based on recognized exemptions.

1. *The Record Does Not Show that Grimberg Was Grossly Negligent*

In order for gross negligence to be established, Grimberg must have intentionally failed "to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another…." *Howard v. Crumlin*, 239 Md. App. 515, 529, 197 A.3d 574 (2018). This standard "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them," and a party is grossly negligent "only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Barbre v.*

[11] Liberty contends that *Kitchens to Go* was wrongly decided on the grounds that it erroneously extended *Walton's* holding to the context of no-damages-for-delay clauses that do not affect the timing of a subcontractor's recovery (which it contends is the case here). [Doc. 46] at 21. Given the Court's ruling, it is not necessary for the Court to find that *Kitchens to Go* was wrongly decided, because that case concerned government-caused delay which implicated the pay-when-paid component of STC ¶ 9; whereas here Liberty expressly seeks to assert the delay damages defense against Grimberg-caused delays only.

*Pope*, 402 Md. 157, 187 (2007) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635, 495 A.2d 838, 846 (1985)).

Aarow argues that there is a material issue of fact as to whether Grimberg was grossly negligent. [Opp.] at 11–12. Liberty contends that as a matter of law Grimberg was not grossly negligent given it retaining and relying "upon the expertise of the specified manufacturer (Nudura) and its preferred, certified and trained installation subcontractor (PCS), while still contracting with a third-party inspector to inspect the work (ECS). [Reply] at 6–7; [Doc. No. 50-7] at 8–9; [Doc. No. 50-9] at 86. Liberty points to record evidence showing Grimberg's engagement with designers, manufacturers, inspectors, and the Government, including active efforts to diagnose and remediate the ICF issues. *Id*; [Doc. No. 50-7] at 10-11, [Doc. No. 46-2]; [Doc. No. 38] ¶ 22.

Based on the present record, the Court concludes as a matter of law that Aarow has not established that the relied upon delays were caused by Grimberg's gross negligence. Even taking Aarow's evidence as true and drawing all reasonable inferences in its favor, that evidence establishes, at most, that Grimberg was inexperienced with ICF construction and that it delegated the work and its inspection to others who Grimberg reasonably considered qualified, and that its hired outside inspector ECS failed to adequately supervise their work. Arrow relies heavily on Grimberg's admissions in a related case that the ICF wall defects were "available to be seen," but this clearly referred to the mere fact that they were not physically concealed from sight and in itself does not, as Aarow contends, establish that it would have been "obvious to anyone who cared to look" that the rebar's placement constituted a severe structural defect.[12] Furthermore,

[12] *See* [Opp.] at 11–12 ("My point is, like in these photographs that are lying on the table here in front of you that show the condition of the vertical rebar being inside the horizontal rebar, that is a condition that anyone can look at and see. You don't have to tear into something else to get there. It's not concealed. It's open and available to be seen.").

the existence of open and obvious defects after the structures were built does not in itself establish gross negligence in the hiring or supervision of subcontractors, particularly where, as here, Grimberg specifically retained an outside inspector for the walls. At most, the record, viewed most favorably to Arrow, may reflect ordinary negligence, not gross negligence or an intentional failure to perform a manifest duty in reckless disregard of the consequences. *Barbre*, 402 Md. at 187.

2. *The Misrepresentation Exception Does Not Apply to Bar Enforceability*

As another independent basis for avoiding the No-Damages-for-Delay clause under Maryland law, Aarow contends that Grimberg repeatedly misrepresented project timelines. [Opp.] at 14–18. [13] Liberty argues that Aarow's evidence does not establish any misrepresentation Grimberg made to them, but rather exclusively misrepresentations to the Government. [Reply] at 7–8.

The misrepresentation exception appears to contemplate only misrepresentations between the parties in the vein of a fraudulent inducement argument. In *Martin Marietta*, the Fourth Circuit held that "Maryland law will enforce exclusion of remedy provisions *unless one party's*

[13] Most notably, Aarow points to several pieces of email correspondence from the Government contracting officer overseeing the project who found that Grimberg had misrepresented, including a November 2022 Schedule Update Review Notes, [Doc. No. 50-13], in which the government stated "[s]imilar to last month, NAVFAC understands the corrective resequencing is the contractor's mitigation measure to ensure the project stays on track. However, it is really starting to appear that the contractor is manipulating the sequencing and resequencing of work to keep the project CCD from slipping."). The Government came to a similar conclusion in December 2022, and in May 2023 found that Grimberg had proposed a "schedule that is not credible or realistic," and it had distributed different versions of a three-week lookahead schedule to the Government and to the subcontractors (and failed to rectify those differences). *Id*. at 22. Finally, on August 5, 2024, the Government advised Grimberg that it would be giving Grimberg an unsatisfactory scheduling rating because:

> [t]he current schedule does not completely represent underway work nor accurately represent future planned activities. The contractor needs to produce a schedule that is constructable and creditable which is a contractual requirement. Month after month schedules reflect a compression of time yet the requires the same workload [sic]. This decrease in duration is causing activities to stack in the shorter timeframe. The provided schedule does not represent an accurate BOD/CCD and this will directly impact the availability of NAVFAC commissioning and acceptance.

[Opp.] at 18; [Doc. No. 50-15] at 5.

*misrepresentations have induced the other party* to *enter* into the contract in the first place." 991 F.2d at 99 (emphasis added). The *Martin Marietta* court separately held that negligent misrepresentations "do not rise to the level of 'fraud,' 'overreaching,' or 'unconscionable conduct'" and so cannot trigger the exception at all. *Id*.

The statements Aarow contends were misrepresentations were made years into the performance of the contract and were made to the Government rather than to Aarow. Aarow does not contend that somehow it was induced to "*enter* into the contract in the first place," or to otherwise reasonably rely on any misrepresentations by Grimberg or that it raised any concerns to Grimberg regarding its purported misrepresentations. Rather, Aarow seems to have continued performance on the project unaffected by Grimberg's statements. Accordingly, the Court concludes as a matter of law that the misrepresentation exception does not apply.

For the above reasons, the No-Damages-for-Delay clause is enforceable and applicable to Arrow's delay damages claim, neither of the relied upon exceptions to the enforceability of that sort of clause under Maryland law applies, and Liberty is entitled to judgment in its favor as matter of law with respect to Arrow's delay damages claim; and because Arrow's claim for unabsorbed home office overhead seeks damages that are widely recognized as a species of delay damages, that component of Aarow's claim is also within the scope of the No-Damages-for-Delay clause. *See Cap. Elec. Co. v. United States*, 729 F.2d 743, 747 (Fed. Cir. 1984) ("For almost 40 years the Court of Claims consistently has held that the delay damages a government contractor may recover include extended home office overhead incurred during the period of delay.").

**C: <u>Aarow's MC Cable Claim is Not Precluded by its Failure to Appeal the Contracting Officer's Final Decision.</u>**

Finally, Liberty seeks summary judgment with respect to Aarow's third category of disputed damages, *viz.*, those associated with the MC Cable that Aarow installed but was forced to remove and replace in various areas, including the ICF walls, on the grounds that Aarow waived that claim by not appealing the April 6, 2023 Contracting Officer's Final Decision ("COFD") determining that the MC Cable did not conform with the project requirements. [Mot.] at 27–28; [Doc. No. 38] ¶¶ 52–57, 66.

Liberty contends that, under the Subcontract's flow-down provision (which by its terms assigns Grimberg's rights under the prime contract to Aarow; *supra* note 2) and the Contract Disputes Act ("CDA;" 41 U.S.C. §§ 7101-7109), Aarow is bound by the unappealed COFD and cannot relitigate its entitlement to compensation for work deemed noncompliant by that decision. *Id*. In this regard, Liberty essentially contends that Aarow's MC Cable claim is barred by the CDA's limitations provision, which provides that "[t]he contracting officer's decision on a claim is final and conclusive and is not subject to review . . . unless an appeal or action is timely commenced."[14] However, this limitations provision applies only to claims under the CDA, not the Miller Act, and Liberty does not dispute that Aarow's Miller Act claim was timely filed, nor does it cite any authority for interpreting Section 7103 as barring Miller Act recovery.

Other considerations counsel in favor of denying Liberty's request for summary judgment on this issue. As courts have repeatedly concluded,[15] Aarow could not have brought a

[14] Under 41 U.S.C. § 7103(g) and the following Section 7104, a contractor may either appeal to an agency board of contract appeals within ninety days of receipt of the COFD or bring an action in the United States Court of Federal Claims within twelve months; otherwise, the COFD becomes final. 41 U.S.C. § 7104(a), (b)(3). As the COFD was issued on April 6, 2023, both of these windows have long since closed.

[15] *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed. Cir. 1983) (holding that the Armed Services Board of Contract Appeals did not have jurisdiction over a subcontractor's direct appeal because the subcontractor was not a "contractor" as that term is defined in the Contract Disputes Act).; *see also Fanderlik-Locke*

CDA claim in the first place, because the CDA only authorizes appeals from "contractors" (defined as "parties to a Federal Government contract other than the Federal Government"). Liberty points to the fact that the Subcontract's flow-down provision empowered Aarow to bring a so-called "pass-through" claim, but that Aarow failed to do even that.[16] *See* [Reply] at 17–18. (citing *Metric Constructors,* 314 F.3d at 579; *Clearwater Constructors, Inc. v. United States*, 56 Fed. Cl. 303 (2003)). But Liberty has not cited any contractual provision or other legal authority (whether statute, regulation, or case) that stands for the proposition that a subcontractor's failure to bring a pass-through claim for government-caused damages precludes recovery under the Miller Act.[17]

Perhaps most dispositive on this issue is that, as discussed above, Miller Act rights cannot be waived unless the waiver is clear and explicit. *See Walton,* 290 F.3d at 1209. No provision in the Subcontract contains clear and explicit language that Aarow would waive recovery under the Miller Act by failing to bring a pass-through claim or otherwise appeal an adverse COFD; and

*Co. v. U.S.*, 285 F.2d 939, 942 (10th Cir. 1960) (holding that a subcontractor could not recover on a claim against the Government because no contract existed between them).

[16] However, numerous cases have held that pass-through claims must be authorized by a specific type of agreement, often referred to as a liquidation agreement (which may be standalone or incorporated into the subcontract), that expressly renders the prime contractor conditionally liable to the subcontractor for government-caused damages. *W.G. Yates & Sons Construction Co. v. Caldera*, 192 F.3d 987, 990–92 (Fed. Cir. 1999); *see also Metric Constructors, Inc. v. United States*, 314 F.3d 578, 581–83 (Fed. Cir. 2002). Liberty does not contend or adduce evidence showing that the flow-down provision expressly imposes conditional liability or that the parties intended as much. Nor do either the "pay-when-paid" provision in STC ¶ 9, or the disputes provision in STC ¶ 15 constitute a liquidation agreement for purposes of the Motion, because the scope of that provision is limited to delay damages. To the contrary, the disputes provision states that "Grimberg shall have no direct liability to the subcontractor except to give the subcontractor the opportunity to exercise Grimberg's rights in accordance with the prime contract." [Doc. No. 46-3] at 6 ¶ 15.

[17] Likewise unclear to the Court is why Grimberg could not have filed, and as between Grimberg and Arrow, should have filed, the appeal itself–or at least put Aarow on notice of its purported right to request a pass-through claim. After all, the COFD related to the requirements of the prime contract for which Grimberg was responsible to the government, and given the facts and circumstances surrounding the MC Cable issue (including Grimberg's settlement with the on September 30, 2021 that waived "any and all claims and potential claims by subcontractors and suppliers at any tier"), it would seem that Grimberg could not have reasonably thought that there would be no issue in simply forcing those additional costs on Arrow, rather than absorbing those costs itself, without any claim back against it by Arrow.

the Court cannot conclude based on the present record that Arrow has waived whatever rights it has under the Miller Act to recover on its MC Cable claim.

## IV. CONCLUSION

For the reasons above, it is hereby

**ORDERED** the Motion [Doc. No. 45] be, and the same hereby is, **GRANTED** as to Arrow's claim for delay damages and otherwise **DENIED;** and it is further

**ORDERED** that the Court will hold a status conference on September 23, 2026 at 10:00 a.m. to schedule a bench trial.

The Clerk is directed to forward copies of this order to all counsel of record.

Anthony J. Trenga
Senior U.S. District Judge

September 11, 2026
Alexandria, Virginia